# In the United States Court of Federal Claims

No. 16-261C

(E-Filed:  December 13, 2017)[1]

_____

PRECISION ASSET MANAGEMENT    )
CORP.,                        )
                              )
        Plaintiff,            )
                              )        Bid Protest;
    v.                        )        Meaningful Discussions;
                              )        48 C.F.R. § 15.306(d)(3) (2015);
UNITED STATES,                )        Injunctive Relief.
                              )
        Defendant,            )
                              )
    and                       )
                              )
ALPINE-FIRST PRESTON JV II LLC, )
                              )
        Intervenor-Defendant. )
_____ )

<u>Sharon A. Roach</u>, Falls Church, VA, for plaintiff.

<u>Lauren S. Moore</u>, Trial Attorney, with whom appeared <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Robert E. Kirschman, Jr.</u>, Director, and <u>Deborah A. Bynum</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  <u>Jonathan English</u>, Trial Attorney, Department of Housing and Urban Development, of counsel.

<u>J. Alex Ward</u>, Washington, DC, for intervenor-defendant.

OPINION

_____

[1]    This opinion was issued under seal on November 9, 2017.  Pursuant to ¶ 5 of the ordering language, the parties were invited to identify source selection, proprietary, or confidential material subject to deletion on the basis that the material was protected/privileged.  The parties submitted their proposed redactions on November 21, 2017 and were acceptable to the court.  Brackets ([ ]) identify the redacted portions of this opinion.

CAMPBELL-SMITH, Judge.

Precision Asset Management Corporation (Precision) filed this post-award bid protest challenging the Department of Housing and Urban Development's (HUD) award of a property management contract to Alpine-First Preston JV II LLC (Alpine).  See Compl., ECF No. 1; Am. Compl., ECF No. 99.  Alpine has intervened.  See Mot. to Intervene, ECF No. 13.  Before the court are the parties' cross-motions for judgment on the administrative record.  See Pl.'s Mot. J. Admin. Rec., ECF No. 90; Def.'s Cross-Mot. J. Admin. Rec., ECF No. 92; Intervenor-Defendant's Cross-Mot. J. Admin. Rec., ECF No. 93.[2]

In its amended complaint, plaintiff seeks injunctive relief, asking that the court: (1) grant declaratory relief and find that defendant acted arbitrarily, capriciously, or irrationally in awarding the contract to Alpine; (2) grant injunctive relief directing defendant to reopen the procurement and engage in meaningful discussions with plaintiff; (3) grant injunctive relief directing defendant to allow plaintiff to submit a revised proposal, to appoint a new technical evaluation panel, contracting officer, and source selection authority, and to reevaluate both plaintiff's and Alpine's proposals; and (4) grant injunctive relief directing defendant to terminate Alpine's contract for convenience if plaintiff's revised proposal is the best value.  See ECF No. 99 at 18-21.  Plaintiff seeks the same injunctive relief in its motion for judgment on the administrative record.  See ECF No. 91 at 8.

For the reasons that follow, plaintiff's motion for judgment on the administrative record is **GRANTED**, and defendant's and intervenor-defendant's cross-motions are **DENIED**.

I.    Background

The Federal Housing Authority (FHA), which is part of HUD, "administers the single-family mortgage insurance program."  See ECF No. 36 at 9.  When a homeowner defaults on an FHA-insured loan, many times, HUD ultimately acquires title to the property.  See id. at 10.  HUD outsources the management of these properties, contracting with various companies for asset management services.  Asset management includes services related to the marketing and sale of the properties HUD has acquired.  See id.

A.    The Solicitation

---

[2]    Intervenor's motion offers no substantive argument; instead, it adopts the arguments made by defendant.  See ECF No. 93.  As such, the court finds it unnecessary to engage in an independent analysis of intervenor's position, and the court's findings and conclusions will apply equally to defendant's and intervenor's motions.

On July 25, 2014, HUD issued Solicitation No. DU204SA-13-R-0005 (the solicitation), requesting proposals for asset management services in twelve geographic areas.  See AR at 44-1062.127 (original solicitation and subsequent modifications).  The area at issue in this action, Area 3A, involves property in Illinois.  See ECF No. 91 at 3.  Once the government received the requested proposals, the evaluation process involved two steps.  HUD, first determined whether each proposal was technically acceptable, on a pass/fail basis.  See AR at 1054.

In those proposals that were deemed technically acceptable, HUD then evaluated which one presented the best value.  See id.  In this second step of the analysis, the agency considered past performance and price, assigning approximately the same relative importance to each.  See id.  In order to determine the strength of a bidder's past performance, the technical evaluation panel (TEP) analyzed the recency, relevancy, and quality of that performance, along with the panel's confidence in the bidder's ability to perform under the contract.  See AR at 1057.

The TEP assigned each proposal one of five adjectival ratings for confidence and quality of past performance:  excellent/high confidence, good/significant confidence, fair/some confidence, no confidence, and neutral/unknown confidence.  See AR at 1060-61.  In coming to these determinations, the TEP was to evaluate the three most recent, relevant references provided by the bidder.  See AR at 1047.  In place of the three most recent, relevant references, a bidder was also permitted to request that the TEP consider efforts with which certain key personnel had been involved.  See AR at 1049.

B.      Precision's Proposal

Precision submitted its initial proposal for all twelve geographic areas on September 23, 2014.  See AR at 2071-2340.   For Area 3A, the only area at issue in this protest, Precision proposed a cost of $37,942,782.59.  See AR at 2329.  The initial proposal included six contract references based on which HUD was to make its past performance evaluation.  See AR at 2266-2277.

By letter, dated August 27, 2015, HUD notified Precision that it had established a competitive range and was initiating discussions.  See AR at 3757.  The letter also stated that the TEP found plaintiff's proposal to be "Technically Acceptable."  See id.  Although the letter generally reads as a form, for context, the court quotes it here in full.

> The Government has determined to conduct discussions in reference to Request for Proposal (RFP) DU204SA-13-R-0005 for M&M 3.7 Asset Manager (AM). This letter is to advise you that the period for discussion/exchanges is now open and written discussions are established.

> Attached to this letter are all discussion points resulting from the evaluation of your proposal(s).  Please note that the enclosed discussion points are to be addressed in writing; final proposal revisions shall be in writing and the Government intends to make award without obtaining further revisions.  You may respond to the attached issues through discussion of your proposal.
>
> Attached are discussion points, which have been tailored to your initial proposal submission.  Amendment 0009 to the solicitation is enclosed with revisions (highlighted in red) to various section[s] of the solicitation to include Section L and M. Offerors are encouraged to review the conform copy of the solicitation in its entirety.
>
> The discussions process is being conducted in writing and offerors must submit a revised Past Performance and Pricing Proposal in accordance with the revisions in Amendment 0009.  Your Technical Proposal has been evaluated as Technically Acceptable.
>
> The attachment shall include a summary of any resulting changes to the original proposal, including the page number and paragraph reference for the change.  Additionally, a revised "redlined" copy of the original proposal, clearly delineating the changes, must be included.  To the extent that Microsoft Word was used to compile the original proposal document, the "track changes" feature will be considered acceptable for submission of a red-lined copy.  The Government intends to make award from the revised red-lined proposal without obtaining further revisions.

Id.

In an attachment enclosed with the letter, HUD noted that it had identified "[n]o weaknesses or deficiencies" in Precision's proposal, and that it had "[n]o adverse past performance information."  AR at 3719.  The only substantive note on the attachment was that while plaintiff's price was "deemed reasonable," it was "either the highest or higher than the overall mean," when compared to other proposals.  Id.  The full text of the attachment appeared as follows:

## PRECISION ASSET MANAGEMENT CORP–DISCUSSION POINTS

### Technical Proposal

- No weaknesses or deficiencies

### Past Performance Proposal

4

- No adverse past performance information

## Price

- Area 3A 4A 5A 6A 7A 8A 1D 2D 1P 3P 4P 5P: Your total proposed price was deemed reasonable. The reasonabless [sic] was determined on the basis for price competition by comparing your proposed price among offerors. Your total proposed priced when compared to the percent difference from the overall mean was determined to be either the highest or higher than the overall mean.

  > Offerors are reminded that additional discounts may be offered when revising your proposal.

AR at 3719.

After conducting its past performance evaluation, HUD assigned plaintiff's proposal a "Neutral/Unknown Confidence" rating for Area 3A, past/present performance. See AR at 4277.  The terms of the solicitation describe a "Neutral/Unknown Confidence" rating as:  "No recent or relevant performance record is available or the Offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned."  See AR at 1061.  The solicitation also states that "a strong record of recent and relevant performance may be considered more advantageous to the Government than an 'Unknown Confidence' rating."  Id.

The record in this case shows that HUD initially assigned plaintiff a neutral/unknown confidence rating, explaining that:

> Based on the review of the three efforts submitted, the questionnaires and the additional write up in volume 3, the government has a neutral level of confidence that the Offeror can perform the quantities required of this area in light of their plan to perform in this area without a Teaming Partner.  Their ratings could have been higher on relevancy if they had included the actual numbers of properties managed.  The scope, magnitude and complexity of the AM PWS are much larger than that of any of the work listed in the three efforts. . . .  The offeror has not demonstrated to the government that they can handle the quantities required in the areas proposed.  As a result, there is a neutral level of confidence in their ability to perform this contract in area 3A and 6A.

AR at 3253-54.

5

HUD revised the solicitation several times, and plaintiff submitted its final proposal on September 9, 2015, see AR at 3854-85, which included "updated Past Performance Information and revised pricing." ECF No. 99 at 9.  In its final proposal, Precision identified three past performance efforts for evaluation: [ ].  See AR at 3854-62.  In its evaluation, the TEP looked at the [ ] efforts, but instead of considering the [ ] effort, it considered the [ ] contract, one of the references identified as relevant to a different area addressed in Precision's proposal.  See ECF No. 91 at 17 (citing to AR at 3854-56).  Precision's final proposed cost was $34,046,506.94.  See AR at 4246.

In its final evaluation of plaintiff's proposal, the TEP maintained its neutral/unknown confidence rating for Area 3A, past/present performance, and used nearly identical language to that in its initial evaluation, stating: "the government has a neutral level of confidence that the Offeror can perform the quantities required for the area.  The scope, magnitude and complexity of the AM PWS are much larger than that of any of the work listed in the three efforts.  As a result, the Government has a neutral level of confidence in the Offeror's ability to perform this solicitation."  AR at 4104.

C.     Alpine-First Preston's Proposal

Alpine submitted its initial proposal on September 12, 2014.  See AR at 1113.  In the cover letter accompanying the proposal, Alpine represented that "Alpine/First Preston JV II is a joint venture established under an SBA approved Mentor/Protégé agreement between Alpine Companies, Inc. . . . , an 8(a) certified minority and woman-owned small business, and First Preston HT, a large firm with extensive experience in formal mentorships and the exact asset management services sought by the Department."  See id. The "HT" stands for "Home Telos."[3]  See ECF No. 92 at 17.  The letter also touted the experience and accomplishments of three individuals:  (1) "[ ];" (2) "[ ];" (3) "[ ]."  AR at 1114.

As part of its initial proposal, Alpine submitted a copy of its joint venture agreement.  See AR at 1182-95.  The agreement was made between Alpine Companies, Inc. and First Preston I, L.P.  See id.  The only mention of HomeTelos is the following statement:  "Alpine and First Preston agree that the joint venture will enter into agreements with HomeTelos, LP, which is an affiliate of First Preston, for access to [ ] to manage the Contracts requirements," but specifically provided that any such agreement would "[ ]."  AR at 1185.  The joint venture agreement also emphasizes that the agreement is exclusively made between Alpine Companies, Inc. and First Preston I, L.P. The section titled "Third Party Rights" states:

---

[3]     The name of this company is variously written as HomeTelos, Home Telos, or Hometelos, throughout the filings and administrative record in this case.  In this opinion, the court has chosen to use the HomeTelos style, but will retain the style used in quoted material.

> This Agreement is entered into solely between the Parties to address governance of their relationship and is not intended to create any legal, equitable, or beneficial interest in any third party, or to vest in any third party any interest with respect to the enforcement or performance of this Agreement.

AR at 1193-94.

Alpine also submitted a copy of the protégé/mentor agreement at issue with its initial proposal.  Like the joint venture agreement, the protégé/mentor agreement was made between Alpine Companies, Inc., as the protégé, and First Preston I, L.P., as the mentor.  See AR at 1172-80.  HomeTelos is not named, in any capacity, in the agreement.  See id.

After reviewing Alpine's initial proposal, the TEP assigned it a "neutral/unknown confidence" rating for past/present performance in Area 3A.  See AR at 3076-77.  The TEP determined that this rating was appropriate because the proposal combined multiple contracts for each past performance effort violated solicitation instructions.  See AR at 3076-79.

By letter, dated August 27, 2015, HUD notified Alpine that it had established a competitive range and was initiating discussions.  See AR at 3731.  The letter also informed Alpine that its proposal had been deemed "Technically Acceptable."  See id.  The body of the letter was identical to the letter HUD sent to Precision, that the court has reproduced above.  As with Precision's letter, HUD attached a separate list of discussion points.  Alpine's attachment read as follows:

### ALPINE/FIRST PRESTON, JV II, LLC – DISCUSSION POINTS

#### Technical Proposal

- No weaknesses or deficiencies

#### Past Performance Proposal

- No adverse past performance information

#### Price

- Areas 3A, 4A, 5A: Your total proposed price was evaluated as reasonable. The reasonabless [sic] was determined on the basis for price competition by comparing your proposed price among offerors.

     ○  3A - Your total proposed priced [sic] when compared to the percent difference from the overall mean was determined to be somewhat higher.

     ○  4A - Your total proposed priced [sic] when compared to the percent difference from the overall mean was determined to be within the mean

     ○  5A - Your total proposed priced [sic] when compared to the percent difference from the overall mean was determined to be within the mean

Offerors are reminded that additional discounts may be offered when revising your proposal.

AR at 3707.

Following the solicitation revisions, Alpine submitted its final proposal on September 9, 2015.  See AR at 3781.  In its final proposal, Alpine did not combine separate contracts for each past performance effort.  See ECF No. 92 at 18-19 (citing to AR at 3788, 3790, and 3792).  Instead, it listed three past efforts, all of which were performed by HomeTelos.  See AR at 3969-70 (listing "Effort #1 Past Experience for HomeTelos, C-OPC-23632, 1A;" "Effort #2 Past Experience for HomeTelos, C-OPC-23637, 2A;" and "Effort #3 Past Experience for HomeTelos, C-OPC-23645, 2D").  On the basis of these past HomeTelos efforts, the TEP revised Alpine's past/present performance confidence rating up to "Excellent/High Confidence" for Area 3A.  See AR at 3969.

The TEP expressly based its revised confidence rating on the involvement of Alpine's joint venture partner.  It stated:  "Based solely on the performance of the Joint Venture Partner First Preston and HomeTelos, the Government has a high expectation that the Offeror will successfully perform the required effort due to the scope, magnitude of work, and complexities matching the solicitation required for the proposed areas."  See AR at 3970.

    D.    The Award

The record lists the entities deemed technically acceptable for Area 3A, and in the competitive range, as follows:

| Company | Total Value of Contract | Confidence Rating |
|---------|------------------------|-------------------|
| 24 Asset Management Corp. | $[ ] | [ ] |

| Capitol Asset Management, LLC | $[ ] | [ ] |
|---|---|---|
| Sage Acquisitions, LLC | $[ ] | Excellent/High Confidence |
| Precision Asset Management | $[ ] | Neutral/Unknown Confidence |
| Alpine-First Preston JV II | $34,284,621.39 | Excellent/High Confidence |
| ARNC Bridge Consulting | $[ ] | [ ] |
| Q Integrated Companies, LLC | $[ ] | [ ] |
| Wynkoop Brokerage Firm, LLC | $[ ] | [ ] |

See AR at 4277.

The TEP recommended that HUD award the contract for Area 3A to Sage Acquisitions, LLC, explaining that "[w]hile Alpine-First Preston, JV II was ranked higher than Sage Acquisitions, LLC (Sage) among those proposals with 'Excellent/High Confidence,' this panel did not see a benefit to the government in selecting a slightly higher past performance for a higher price." See AR at 4256-57. Contrary to this recommendation, the Source Selection Authority (SSA) decided to award the contract to Alpine. In his decision letter, he stated:

> I determine that making award to the best overall offeror in terms of past performance outweighs the minimal difference in price, especially when taking into account the real property value of the portfolio they will be administering and potential disastrous costs to the public and the Government if failure were to occur. It is essential that we award the contract to the offeror who will provide the best confidence of likely success, given the relatively small difference in prices.

AR at 4279.

In awarding the contract to Alpine, the SSA adopted the TEP's reasoning with regard to its revised confidence rating, noting that Alpine "is a small business protégé with a mentor who provides guidance and support. The mentor role is being filled by First Preston/Hometelos, a current asset manager in numerous M&M 3.0 contract areas with a wealth of knowledge in property disposition." Id. The SSA concluded, with regard to the joint venture that: "This organizational structure allows for First Preston/Hometelos' past performance to be applied in full, increasing the venture's overall rating." Id.

E.    Plaintiff's Protest

9

Plaintiff initially filed this protest action on February 24, 2016.  See ECF No. 1.
The administrative record was filed on March 7, 2016.  See ECF No. 20.  Shortly
thereafter, on March 15, 2016, plaintiff filed an unopposed motion to stay consideration
of the merits of the protest pending the resolution of potentially relevant proceedings
before the Small Business Administration's Office of Hearings and Appeals.  See ECF
No. 21.  Plaintiff, however, requested that the court grant temporary injunctive relief
during the stay.  See id.; ECF No. 23.  The court considered plaintiff's motion for a
temporary restraining order, but denied the requested relief.  See ECF No. 29.

After ruling on the motion for a temporary restraining order, the court agreed to
consider defendant's and intervenor's motions to dismiss, notwithstanding the stay of the
merits consideration.  See id.  Prior to considering the motions, this matter was
consolidated with another protest action relating to the same solicitation, see ECF No. 31
(order consolidating this case with Q Integrated Cos. v. United States, Case No. 16-442).
Defendant and intervenor then each moved to dismiss the complaints for lack of standing.
See ECF No. 36 (defendant's motion to dismiss), ECF No. 37 (intervenor's motion to
dismiss).

Following resolution of the motions to dismiss in plaintiffs' favor, see ECF No.
72, the case remained stayed until May 5, 2017, see ECF No. 87.  Shortly after the stay
was lifted, Q Integrated filed a stipulation of dismissal, and the case proceeded with
Precision as the sole plaintiff.  See ECF No. 88.  The parties then filed the cross-motions
for judgment on the administrative record now before the court.  See ECF Nos. 90, 92,
93.  Briefing was completed on August 15, 2017, see ECF No. 102, and oral argument
was deemed unnecessary.

In its amended complaint, plaintiff challenges the award to Alpine on three
grounds.  It claims that:  (1) HUD's award decision was arbitrary and capricious because
HUD "failed to follow its own evaluation criteria and process," failed "to evaluate
Precision's past/performance references," and assigned Precision "an inapplicable
rating," see ECF No. 99 at 18-19; (2) HUD's award decision was arbitrary and capricious
because it "improperly evaluated Alpine's proposal and the subsequent selection of
Alpine by the Source Selection Authority was based on the false premise that Alpine was
HomeTelos, LP and that HomeTelos, LP was going to be performing 60% of the work,"
see id. at 19; and (3) HUD violated its duty to engage in meaningful discussions pursuant
to 48 C.F.R. § 15.306(d) (2015), see id.

Plaintiff seeks permanent injunctive relief, asking that the court:  (1) grant
declaratory relief and find that defendant acted arbitrarily, capriciously, or irrationally in
awarding the contract to Alpine; (2) grant injunctive relief directing defendant to reopen
the procurement and engage in meaningful discussions with plaintiff; (3) grant injunctive
relief directing defendant to allow plaintiff to submit a revised proposal, appoint a new
technical evaluation panel, contracting officer, and source selection authority, and to

reevaluate both plaintiff's and Alpine's proposal; and (4) grant injunctive relief directing defendant to terminate Alpine's contract for convenience if plaintiff's revised proposal is the best value.  See ECF No. 99 at 18-21; see also ECF No. 91 at 8 (plaintiff seeks the same permanent injunctive relief in its motion for judgment on the administrative record).

II.    Legal Standards

The Tucker Act grants this court jurisdiction

to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement . . . without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2012).

The court's analysis of a "bid protest proceeds in two steps."  Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  First, the court determines, pursuant to the Administrative Procedure Act standard of review, whether the "agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907-08 (Fed. Cir. 2013) (citing 28 U.S.C. § 1491(b)(4) (adopting the standard of 5 U.S.C. § 706)).  If the court finds that the agency acted in error, the court then must determine whether the error was prejudicial.  See Bannum, 404 F.3d at 1351.

To establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'"  Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999) (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996)).  "In other words, the protestor's chance of securing the award must not have been insubstantial."  Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003).  The substantial chance requirement does not mean that plaintiff must prove it was next in line for the award but for the government's errors.  See Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014); see also Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.").  Demonstrating prejudice does require, however, that the plaintiff show more than a bare possibility of receiving the award.  See Bannum, 404 F.3d at 1358 (affirming the trial court's determination that the plaintiff had not demonstrated a substantial chance of award when its "argument rest[ed] on mere numerical possibility, not evidence").

Given the considerable discretion allowed contracting officers, the standard of review is "highly deferential." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000). As the Supreme Court has explained, the scope of review under the "arbitrary and capricious" standard is narrow. See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974). "A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and "[t]he court is not empowered to substitute its judgment for that of the agency.'" Id. (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)); see also Weeks Marine Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) (stating that under highly deferential rational basis review, the court will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'") (citing Advanced Data Concepts, 216 F.3d at 1058).

III.    Analysis

In its motion, plaintiff outlines three errors that defendant allegedly committed in the bid evaluation and award process: (1) defendant failed to engage in meaningful discussions in violation of Federal Acquisition Regulation (FAR) 15.306(d); (2) defendant failed to properly evaluate plaintiff's proposal in accordance with the solicitation; and (3) defendant failed to properly evaluate Alpine's proposal in accordance with the solicitation. See ECF No. 91 at 7. As the court has previously determined, plaintiff has standing to bring these challenges. See ECF No. 72 at 10, 12. The court will address each allegation in turn.

A.    Meaningful Discussions and Evaluation of Plaintiff's Proposal

FAR 15.306(d) governs the conduct of negotiations, also called discussions, in the context of the competitive acquisition process at issue here. See 48 C.F.R. § 15.306. The express intent of providing for discussions is to "allow[ ] the offeror to revise its proposal." 48 C.F.R. § 15.306(d). Any such discussions must be "tailored to each offeror's proposal," and are conducted for the primary purpose of "maximiz[ing] the Government's ability to obtain best value, based on the requirement[s] and the evaluation factors set forth in the solicitation." 48 C.F.R. § 15.306(d)(1)-(2). Section 15.306(d) does not require that discussions be exhaustive, but provides that, "[a]t a minimum, the contracting officer must . . . indicate to, or discuss with, each offeror still being considered for award, deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." 48 C.F.R. § 15.306(d)(3).

1.    Defendant Was Required To Engage In Meaningful Discussions

a.    Defining Significant Weakness, Deficiency, And Adverse Performance  Information

12

The FAR defines "significant weakness" as "a flaw that appreciably increases the risk of unsuccessful contract performance," and "deficiency" as the "material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level." 48 C.F.R. § 15.001 (2015).

The solicitation defines "adverse past/present performance information" as "information that supports a less than satisfactory rating on any evaluation element or any unfavorable comments received from sources without a formal rating system." AR at 1062. The section continues, distinguishing adverse performance information from "minor or clerical errors," to which a contracting officer is not required to seek a response. See id. In a case involving the same solicitation at issue here, the court noted that "[i]n effect, adverse past performance includes both negative information about the offeror received from references, as well as any other past performance information that would rise to the level of a deficiency or significant weakness." Q Integrated Cos. v. United States, 126 Fed. Cl. 124, 144, appeal dismissed, 691 F. App'x 906 (Fed. Cir. 2016), motion for relief from judgment denied, 131 Fed. Cl. 125 (2017).

The court has observed that "these definitions have been inconsistently applied in decisions by this court and the [Government Accountability Office]." See id. As a general matter, however, the court looks to whether the potential deficiency, significant weakness, or adverse past performance information would materially affect the offeror's chance of receiving the award. See id. at 144-45 (collecting cases to illustrate the materiality inquiry). Put another way, the agency must discuss weaknesses or deficiencies that "could have a competitive impact." Orca Nw. Real Estate Servs. v. United States, 65 Fed. Cl. 1, 8-9, on reconsideration, 65 Fed. Cl. 419 (2005).

In its cross-motion, defendant seeks to establish, through citation of decisions issued by the Government Accountability Office (GAO), that "agencies need not raise lack of relevance or relevance ratings in discussions or communications." ECF No. 92 at 41, n.14 (collecting GAO decisions). The holdings cited by defendant, however, are not as categorical as it suggests. A careful review of the decisions reveals that the GAO considers the facts of a particular protest before determining whether the information at issue triggers the meaningful discussion requirement. See, e.g., Standard Commc'ns, Inc., B-296972, Nov. 1, 2005, 2005 CPD ¶ 200 at 6 ("Where the nature and ultimate relevance of past performance information is clear to the agency, and the offeror received a neutral rating, the agency need not conduct discussions or otherwise communicate with the offeror regarding the information.") (emphasis added) (citations omitted); Jam Corp., B-408775, Dec. 4, 2013, 2013 CPD ¶ 282 at 5 ("None of the agency's evaluation conclusions about the relevance or recency of JAM's past performance references rise to the level of a deficiency or significant weakness, nor are they adverse past performance information that must be raised during discussions.") (emphasis added) (citations

13

omitted); see also REO Solution, LLC v. United States, 125 Fed. Cl. 659, 664-65 (2016) (considering the specific facts at issue before concluding that a Fair/Some Confidence rating "cannot amount to a deficiency or serious weakness"). This fact-centered approach dove-tails with the focus on materiality or competitive impact outlined by the court in Q Integrated.

Defendant criticizes the logic of the decision in Q Integrated, and discourages this court from adopting the reasoning therein. Defendant argues that the court's focus on materiality is misplaced because such an approach "would mean that the very same issue could be considered a significant weakness to this Court for one offeror if it affects its rating, but remain a non-significant weakness to another offeror if it does not end up having an effect on its rating based on cumulative evaluation." ECF No. 92 at 42. Defendant warns that applying this circumstance-dependent view would be unfair, confusing, and would rob the contracting officer of his or her discretion. See id.

The court disagrees. Advancing a fact-centered, materiality-based approach enhances the agency's discretion, allowing it to focus discussions on truly relevant issues. Moreover, conducting a circumstance-specific analysis is directly in line with the regulation's admonition that discussions must be "tailored to each offeror's proposal." 48 C.F.R. § 15.306(d)(1); see also CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 716 (2012) (noting that "'since the need for clarifications or revisions will vary with the proposals,' and since the concept of what is 'meaningful' hinges on those differences, the FAR and the decisional law interpreting it provide few bright lines") (internal citations omitted).

The court also notes that defendant emphasizes that plaintiff has the burden to "write and structure its proposal" in accordance with the solicitation. ECF No. 92 at 37. The court does not find otherwise, but plaintiff's responsibility does not displace defendant's duty with regard to discussions pursuant to FAR 15.306(d).

> b.      Plaintiff's Proposal Involved A Significant Weakness,
>         Triggering The Requirement For Meaningful Discussions

Here, plaintiff alleges that the flaws in its proposal which resulted in its "neutral/unknown confidence" rating were sufficiently substantive to trigger the requirement for meaningful discussions. Specifically, plaintiff contends that the contracting officer should have communicated the TEP's concerns that: (1) plaintiff did not propose a teaming partner for Area 3A (as reflected in the TEP's initial report, AR at 3253), (2) two of the references were deemed "not relevant," (as reflected in the TEP's initial report, AR at 3266, 3271), and (3) plaintiff's proposal did not adequately demonstrate its ability to manage the scope and complexity of the work (as reflected in

both the initial and final reports, AR at 3253, 4104). [4]  See ECF No. 91 at 29.

The court notes that although defendant evaluated two references as "not relevant" in the initial report, after considering plaintiff's revised proposal, one of those references was changed from "not relevant" to "relevant." See AR at 4117.  This change appears to be in response to plaintiff's inclusion of "monthly inventory data," which was added for each reference in the revised proposal.  ECF No. 91 at 18 (citing AR at 3854-56).  The final report did not specifically address the lack of a teaming partner as noted in the initial report, but it did reiterate defendant's concern regarding whether plaintiff would be able to "perform the quantities required for this area," because "[t]he scope, magnitude and complexity of the AM PWS are much larger than that of any of the work listed in the three efforts."  AR at 4104.

In its response, defendant argues that it did not violate FAR 15.306(d) because "there were no significant weaknesses, or deficiencies, to be raised and thus HUD did not fail to disclose any."  ECF No. 92 at 35.  Defendant also makes the bare assertion, without subsequent argument, that "Precision is unable to show that HUD's discussions were not meaningful."  Id.

Defendant's claim that plaintiff's proposal had no significant weaknesses, deficiencies, or adverse performance information is rooted in its assertion that plaintiff's proposal was assigned a neutral rating, and that "a neutral rating is, by definition, not unfavorable and is not less than satisfactory."  See ECF No. 92 at 36 (citing 48 C.F.R. § 15.305(a)(2)(iv) (2015), which states that "[i]n the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance").  This argument, however, fails to address the notice in the solicitation that "a strong record of recent and relevant performance may be considered more advantageous to the Government than an 'Unknown Confidence' rating."  AR at 1061.  It is apparent from the final award decision of the Source Selection Authority that the confidence rating was of critical importance in the context of this solicitation.  The decision letter stated:

> I determine that making award to the best overall offeror in terms of past performance outweighs the minimal difference in price, especially when taking into account the real property value of the portfolio they will be

---

[4]    Plaintiff also identifies two additional alleged errors as part of this list. Specifically, plaintiff claims that defendant failed to adhere to the terms of the solicitation when it:  (1) did not evaluate additional references after finding two references were "not relevant," and (2) did not evaluate the Area 3A proposal on a stand-alone basis.  See ECF No. 91 at 29.  Because these alleged errors are not flaws in plaintiff's proposal that defendant potentially should have disclosed, the court does not address them as part of the present analysis.

administering and potential disastrous costs to the public and the Government if failure were to occur.  <u>It is essential that we award the contract to the offeror who will provide the best confidence of likely success</u>, given the relatively small difference in prices.

AR at 4279 (emphasis added).  Considering all of this together, the court concludes that while defendant was not required to consider an unknown or neutral confidence rating as an unfavorable assessment, it exercised its discretion to do so in this instance.

More importantly, however, the TEP reports identify a fundamental failure of plaintiff's proposal to demonstrate that it was capable of performing the contract.  The initial report stated, in relevant part:

[T]he government has a neutral level of confidence that the Offeror can perform the quantities required of this area in light of their plan to perform in this area without a Teaming Partner.  Their ratings could have been higher on relevancy if they had included the actual numbers of properties managed.  The scope, magnitude and complexity of the AM PWS are much larger than that of any of the work listed in the three efforts. . . . The offeror has not demonstrated to the government that they can handle the quantities required in the areas proposed.  As a result, there is a neutral level of confidence in their ability to perform this contract in area 3A and 6A.

AR at 3253-54.  This assessment was slightly revised in the final report, which stated that "the government has a neutral level of confidence that the Offeror can perform the quantities required for the area.  The scope, magnitude and complexity of the AM PWS are much larger than that of any of the work listed in the three efforts.  As a result, the Government has a neutral level of confidence in the Offeror's ability to perform this solicitation."  AR at 4104.

Defendant argues that "[a]n unknown risk, the rating Precision received, does not equate to an increased risk of unacceptable performance."  ECF No. 100 at 14.  While it may be true that an unknown risk does not <u>necessarily</u> equate to an increased risk of unacceptable performance, it is clear that the evaluators in this case chose to treat it as such.  Indeed, the Source Selection Authority's final recommendation highlighted the risk that plaintiff would be unable to successfully perform based on the past performance evaluations:

Based upon the past performance of the entities of the [Alpine] joint venture, the risk of nonperformance by Alpine/First Preston is minimal compared to the risk of nonperformance by Precision Asset Management Corp with no similar record of performing the services.  I find that a better past performance is worth paying the additional costs to obtain a firm with

> relevant and quality of past performance history will significantly reduce the
> risk of unsuccessful . . . performance and determine Precision Management
> Corp to be eliminated from further consideration.

AR at 4279.  Given the agency's stated view that "it is essential that we award the
contract to the offeror who will provide the best confidence of likely success," see id., the
court finds that the agency should have treated its conclusion that plaintiff had "not
demonstrated to the government that they can handle the quantities required in the areas
proposed," see AR at 3254, as a significant weakness.

Whether that conclusion was prompted by the lack of a teaming partner,
inadequate past performance information, or some other undisclosed material failure, it is
clear that, in defendant's view, the proposal included "a flaw that appreciably increase[d]
the risk of [plaintiff's] unsuccessful contract performance."  See 48 C.F.R. § 15.001
(defining "significant weakness").  This decision is in line with the conclusions in Q
Integrated, a case that the court finds relevant and persuasive.  See Q Integrated, 126 Fed.
Cl. at 146 ("Because the relevancy ratings and associated concerns were the primary
reason for this rating, they fall within the FAR's definition of a significant weakness as 'a
flaw [in the proposal] that appreciably increases the risk of unsuccessful contract
performance.'") (citing FAR 15.001).

2.      Defendant Failed To Engage In Meaningful Discussions

Because plaintiff's proposal included a significant weakness, defendant was
required to address the issue in its discussions with plaintiff.  See 48 C.F.R. §
15.306(d)(3) ("At a minimum, the contracting officer must . . . indicate to, or discuss
with, each offeror still being considered for award, deficiencies, significant weaknesses,
and adverse past performance information to which the offeror has not yet had an
opportunity to respond.").  When a proposal involves a deficiency, significant weakness,
or adverse past performance information, discussions about those issues must be
"meaningful."  Orca, 65 Fed. Cl. at 8-9 (citations omitted).  "Case law provides that
discussions are meaningful if they generally lead offerors into the areas of their proposals
requiring amplification or correction, which means that discussions should be as specific
as practical considerations permit."  Advanced Data Concepts, Inc. v. United States, 43
Fed. Cl. 410, 422 (1999) (internal quotations and citations omitted), aff'd, 216 F.3d 1054
(Fed. Cir. 2000).

According to plaintiff, the only discussions between plaintiff and defendant came
in the form of a letter, sent to plaintiff by the contracting officer on August 27, 2015.  See
ECF No. 91 at 16 (identifying this letter as "the entirety of discussions HUD held with
Precision").  Defendant has offered no facts to dispute this characterization.  See
generally ECF No. 92 at 9-24 (defendant's statement of facts).  To the letter, the
contracting officer attached "discussion points, which have been tailored to [plaintiff's]

17

initial proposal submission." See AR at 3757. The attachment stated that plaintiff's proposal had "[n]o weakness or deficiencies," "[n]o adverse past performance information," and noted that plaintiff's total proposed price "was deemed reasonable," but that it was "determined to be either the highest or higher than the overall mean." AR at 3719.

These discussion points in no way constitute a meaningful exchange, and actually served to mislead plaintiff as to the status of its proposal. Thus, defendant has failed to comply with the requirements of FAR 15.306(d)(3) in evaluating plaintiff's proposal.

3.    Lack Of Meaningful Discussions Prejudiced Plaintiff

Although the court has concluded that defendant violated FAR 15.306(d)(3) by failing to engage in meaningful discussions with plaintiff, in order to be actionable, that violation must also have been prejudicial. See Impreza Construzioni Geom. Domenici Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (stating that when a bid protest involves the violation of a regulation, "the disappointed bidder must show a clear and prejudicial violation of applicable statues or regulations") (internal quotations omitted). As explained above, to establish prejudice, "a protester must show 'that there was a substantial chance it would have received the contract award but for that error.'" Alfa Laval, 175 F.3d at 1367 (quoting Statistica, 102 F.3d at 1582). "In other words, the protestor's chance of securing the award must not have been insubstantial." Info. Tech., 316 F.3d at 1319.

The court cannot predict precisely how plaintiff would revise its proposal in light of meaningful discussions. Nor can it foresee exactly how that revised proposal would be evaluated. Nevertheless, the known and reasonably inferred facts show that plaintiff would have a substantial—or at least not an insubstantial—chance of receiving the award following the opportunity to make revisions.

First, the record lists the entities deemed technically acceptable, and in the competitive range, as follows:

| Company | Total Value of Contract | Confidence Rating |
|---|---|---|
| 24 Asset Management Corp. | $[ ] | [ ] |
| Capitol Asset Management, LLC | $[ ] | [ ] |
| Sage Acquisitions, LLC | $[ ] | Excellent/High Confidence |
| Precision Asset Management | $[ ] | Neutral/Unknown Confidence |
| Alpine-First Preston JV II | $34,284,621.39 | Excellent/High Confidence |

| ARNC Bridge Consulting | $[ ] | [ ] |
|---|---|---|
| Q Integrated Companies, LLC | $[ ] | [ ] |
| Wynkoop Brokerage Firm, LLC | $[ ] | [ ] |

See AR at 4277.  If plaintiff were able to improve its confidence rating, through proposing a teaming partner, offering additional or more relevant past performance information, or otherwise addressing the agency's concerns about its ability to handle the scope and complexity of the contract, its price puts its squarely in contention for the award.  See Q Integrated, 126 Fed. Cl. at 147 (ruling that discussions were inadequate and explaining that "[h]ad the government disclosed its concerns about the relevance of [plaintiff's] prior experience . . . [plaintiff] could have taken a number of steps to mitigate those concerns in its final proposal revision.").

Defendant argues, at length, that even if it were to remedy the various complaints that plaintiff raises with regard to the way in which its proposal was evaluated, plaintiff still could not establish a substantial chance of receiving the award because it could not surpass the past performance ratings earned or the price offered by Sage Acquisitions, LLC.  See ECF No. 92 at 29-34.  The problem with this analysis is two-fold.  First, it fails to address the fact that had defendant engaged in meaningful discussions, plaintiff's proposal might have undergone significant changes.  Thus, measuring plaintiff's present proposal against Sage's proposal is the wrong metric.

In addition, defendant's claim that plaintiff could not have prevailed as the awardee over Sage due to its higher price falls flat.  Defendant argues that "even if Precision's past performance rating were equal to that of Sage, it would still have no chance of award given its higher price."  See ECF No. 92 at 34.  As the chart above illustrates, defendant's actual award decision belies this statement.  Both Alpine and Sage received "Excellent/High Confidence" ratings, but Alpine received the award despite offering a higher price.

For the foregoing reasons, the court concludes that defendant failed to engage in meaningful discussions, and that plaintiff was prejudiced as a result.  The remedy for this failure, in the form of injunctive relief, will be addressed fully below.  But because the conduct of meaningful discussions will likely result in significant revisions to plaintiff's proposal, a detailed analysis of defendant's evaluation of the existing proposal is unnecessary.

B.    Evaluation of Alpine-First Preston's Proposal

In its evaluation of Alpine's final proposal, the TEP reviewed three past/present performance efforts for Area 3A, all of which were performed by HomeTelos.  See AR at

3969-70 (listing "Effort #1 Past Experience for HomeTelos, C-OPC-23632, 1A;" "Effort #2 Past Experience for HomeTelos, C-OPC-23637, 2A;" and "Effort #3 Past Experience for HomeTelos, C-OPC-23645, 2D"). On the basis of the past HomeTelos efforts, the TEP assigned Alpine's final proposal a rating of "Excellent/High Confidence." See AR at 3969.

The TEP expressly based its confidence rating on the involvement of Alpine's joint venture partner. It stated: "Based solely on the performance of the Joint Venture Partner First Preston and HomeTelos, the Government has a high expectation that the Offeror will successfully perform the required effort due to the scope, magnitude of work, and complexities matching the solicitation required for the proposed areas." AR at 3970. In making the award, the SSA adopted this reasoning, noting that Alpine is "a small business protégé with a mentor who provides guidance and support. The mentor role is being filled by First Preston/Hometelos, a current asset manager in numerous M&M 3.0 contract areas with a wealth of knowledge in property disposition." AR at 4279. The SSA concluded, with regard to the joint venture, that: "This organizational structure allows for First Preston/Hometelos' past performance to be applied in full, increasing the venture's overall rating." See id.

In its motion, plaintiff argues that defendant improperly evaluated Alpine's proposal because the confidence rating was "based solely on the experience of Home Telos, LP," despite the fact that "Home Telos, LP was neither a partner in the Joint Venture, not Alpine Companies' mentor, nor a proposed subcontractor to Alpine." See ECF No. 91 at 38-39.

The record supports this characterization of HomeTelos's relationship to Alpine. The joint venture agreement that was submitted with Alpine's initial proposal is between Alpine Companies, Inc. and First Preston I, L.P. See AR at 1182-95. HomeTelos is not a party to the agreement, and the contract includes a clause emphasizing that the contract exclusively governs the relationship between Alpine Companies, Inc. and First Preston I, L.P. See id. at 1193-94. In fact, the only mention of HomeTelos in the agreement is the following statement: "Alpine and First Preston agree that the joint venture will enter into agreements with HomeTelos, LP, which is an affiliate of First Preston, for [ ] to manage the Contracts requirements," but specifically provided that any such agreement would "[ ] under [the joint venture agreement]." AR at 1185 (emphasis added). In addition, First Preston I, L.P., not HomeTelos, is Alpine's mentor. See AR at 1172-80.

The question, therefore, is whether the agency acted appropriately in relying solely on the past experience of an affiliate of one of the joint venture partners in evaluating Alpine's past performance.

As this court has held, "[a]n agency properly may attribute the experience or past performance of a parent or affiliated company to an offeror where the firm's proposal

20

demonstrates that the resources of the parent or affiliated company will affect the performance of the offeror." Femme Comp Inc. v. United States, 83 Fed. Cl. 704, 747 (2008). In determining whether this standard is met, the court examines whether "the affiliate will have meaningful involvement in the contract performance." Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 722 (2010) (citing Femme Comp, 83 Fed. Cl. at 746). Even if defendant were able to demonstrate meaningful involvement, the guidance in Femme Comp merely "permits, rather than requires, attribution of the affiliate's past performance to the offeror." See id. at 722. The GAO has given, as examples of meaningful involvement, reliance on the "workforce, management, facilities, or other resources" of the parent or affiliated company. IAP World Servs. Inc., B-407917.2, July 10, 2013, 2013 CPD ¶ 171.

Defendant argues that it properly considered the past performance of HomeTelos for three reasons. First, the joint venture planned to use the same address for office facilities as First Preston and HomeTelos. See ECF No. 92 at 45. Second, defendant contends that Alpine's "proposal demonstrates that it intended to rely on key management of HomeTelos as key personnel and management for the joint venture offeror's own performance." See id. And finally, defendant points to the language of the joint venture agreement stating that Alpine planned to depend on HomeTelos resources in the form of contracting "for [ ] to manage Contracts requirements." AR at 1185.

As to the first argument, the court does not view having the same physical address as evidence of HomeTelos's meaningful involvement in Alpine's contract performance absent a specific rationale for drawing that conclusion. Defendant has offered no such explanation. And as to the third argument, the court agrees that using HomeTelos' "[ ]" could rationally be considered a substantive use of resources. It is not evident from the record, however, that Alpine's contracting to use technology developed by HomeTelos requires any actual, much less "meaningful," involvement from HomeTelos in the contract performance.

Defendant's argument that it planned to rely on key HomeTelos personnel is more difficult to assess. The cover letter submitted with Alpine's initial proposal highlighted the experience and accomplishments of three individuals: (1) "[ ];" (2) "[ ];" and (3) "[ ]." AR at 1114. In its brief, defendant has identified [ ] and [ ] as "key management for HomeTelos." ECF No. 92 at 45. The same individuals are identified in the proposal as key personnel. AR at 1273-74, 3794-95. HomeTelos, however, is not mentioned either in the cover letter or the section of the proposal listing key personnel. Defendant connects [ ] and [ ] to HomeTelos through a number of record citations, all of which link to past performance references. See ECF No. 92 at 45-46 (collecting record citations to "HomeTelos's past performance references").

It is clear from the record that [ ] and [ ] were involved with past efforts on behalf of HomeTelos, and that the TEP found those efforts relevant to the present solicitation.

21

The difficulty with adopting defendant's justification for relying on the key HomeTelos personnel, however, is that the TEP and the SSA relied on HomeTelos's experience with the express understanding that it was either a member of the joint venture or was serving as mentor to the joint venture.  See AR at 3970 (TEP report characterizing HomeTelos as a member of the joint venture), 4279 (SSA award letter characterizing HomeTelos as mentor to the joint venture).  Both assumptions were incorrect.  As noted above, the joint venture agreement identifies Alpine Companies, Inc. and First Preston I, L.P. as the joint venture partners.  See AR at 1182-95.  And the mentor-protégé agreement identifies First Preston I, L.P. as Alpine Companies, Inc.'s mentor.  See AR at 1172-80.

Thus, what defendant asks the court to do is to conclude that reliance on the key personnel and resources of an affiliate of one of the joint venture partners engenders confidence equivalent to reliance on a joint venture partner or mentor.  While the court does not find that it would be categorically inappropriate for an agency to take such a position, that is simply not the basis of the TEP or SSA's evaluation of Alpine's proposal here.  As such, drawing this conclusion would substitute the court's opinion for that of the agency, in violation of one of the cardinal rules of this court's bid protest authority.  See Bowman, 419 U.S. at 285 ("A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,'" and "[t]he court is not empowered to substitute its judgment for that of the agency.'") (quoting Citizens to Preserve Overton Park, 401 U.S. at 416).

The court, therefore, concludes that the award to Alpine was irrational because it was premised on the mistaken belief that HomeTelos was a joint venture partner or a mentor to Alpine.  And in addition to the reasons articulated for concluding that plaintiff was prejudiced by defendant's failure to conduct meaningful discussions, the court finds that plaintiff was further prejudiced by defendant's improper evaluation of Alpine's proposal.  The TEP awarded Alpine the highest confidence rating based on a misunderstanding of the relationship between Alpine and HomeTelos.  Any downward revision to Alpine's rating that may result from correcting this error would place plaintiff in a stronger position in line for the award.

C.     Injunctive Relief

As noted above, in its amended complaint, plaintiff seeks permanent injunctive relief, asking that the court:  (1) grant declaratory relief and find that defendant acted arbitrarily, capriciously, or irrationally in awarding the contract to Alpine; (2) grant injunctive relief directing defendant to reopen the procurement and engage in meaningful discussions with plaintiff; (3) grant injunctive relief directing defendant to allow plaintiff to submit a revised proposal, appoint a new technical evaluation panel, contracting

officer, and source selection authority,[5] and to reevaluate both plaintiff's and Alpine's proposal; and (4) grant injunctive relief directing defendant to terminate Alpine's contract for convenience if plaintiff's revised proposal is the best value.  See ECF No. 99 at 18-21.  Plaintiff seeks the same permanent injunctive relief in its motion for judgment on the administrative record.  See ECF No. 91 at 8.

According to the Federal Circuit,

In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) (citation omitted).

Here, plaintiff has succeeded on the merits of its case.  In addition, plaintiff has shown that absent injunctive relief, it will suffer irreparable harm in the form of the lost opportunity to compete fairly for the award at issue.  See, e.g., Fed. Acquisition Servs. Team, LLC v. United States, 124 Fed. Cl. 690, 708 (2016) ("It is well-established that the profits lost by an offeror because of the government's arbitrary or unlawful rejection of an offer constitute irreparable injury for purposes of injunctive relief."); Hosp. Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618, 624 (2005) ("Here, absent injunctive relief, [the protestor] will lose the opportunity to earn the profit it would have made under this contract.  Such loss of profit, stemming from a lost opportunity to compete for a contract on a level playing field has been found sufficient to constitute irreparable harm.") (citations omitted).

As to the balance of hardships, plaintiff argues that it would suffer more harm absent injunctive relief, than either the government or Alpine would suffer if such relief is granted.  See ECF No. 91 at 43.  Specifically, plaintiff claims: "(1) it will be denied the opportunity to fairly compete for [the] award; (2) it will lose the profits from the contract; and (3) it will be denied an adequate remedy."  Id.  Plaintiff also notes that where bids are improperly evaluated, defendant suffers the loss of ensuring it receives the best value on the contract.  See id. at 43-44.  The potential harm to defendant and Alpine, according to plaintiff, would be minimal.  "Alpine is currently performing the contract,

---

[5]     Plaintiff makes no argument in its motion for judgment on the administrative record that it is necessary to appoint a new TEP, contracting officer, or SSA.  The court has seen no evidence that the professionals involved with this evaluation process are incapable of conducting a fair reevaluation of the bids in this case.  As such, the court will give no further consideration to this part of plaintiff's request.

and the contract contains a specific and detailed transition period requirement for coordination between new awardees and former contractors, so that the services are performed without interruption during any change of contractor." Id. at 44. Defendant offers no alternative view on this point, and the court agrees with plaintiff's assessment. The balance of hardships here favors injunctive relief.

And finally, the court concludes that injunctive relief is in the public interest. Having heard no argument to the contrary from defendant, the court will adhere to the general principles of protecting that interest. "It is axiomatic that the public has an interest in honest, open, and fair competition in the procurement process. Whenever a plaintiff is improperly excluded from that process, that interest is compromised." Cincom Sys., Inc. v. United States, 37 Fed. Cl. 266, 269 (1997) (citing Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993); see also Alion Sci. & Tech. Corp. v. United States, 74 Fed. Cl. 372, 376 (2006) ("It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations.") (citation omitted); Metcalf Constr. Co. v. United States, 53 Fed. Cl. 617, 645 (2002) (noting the twin goals of preserving "public confidence and competition in the federal procurement process") (citation omitted).

For all of these reasons, plaintiff has demonstrated that injunctive relief is appropriate.

IV.    Conclusion

Plaintiff has demonstrated that defendant failed to conduct meaningful discussions pursuant to 48 C.F.R. § 15.306(d)(3), and that defendant improperly evaluated Alpine's proposal. Plaintiff has also shown that it was prejudiced by defendant's errors. Plaintiff's bid protest is, therefore, sustained. In addition, plaintiff is entitled to injunctive relief. Accordingly, it is hereby **ORDERED** that:

(1)    Plaintiff's motion for judgment on the administrative record, ECF No. 90, is **GRANTED**;

(2)    Defendant's cross-motion for judgment on the administrative record, ECF No. 92, is **DENIED**;

(3)    Intervenor-defendant's cross-motion for judgment on the administrative record, ECF No. 93, is **DENIED**;

(4)    Plaintiff's request for declaratory and permanent injunctive relief, as requested in its amended complaint, ECF No. 99, is **GRANTED** as follows:

(a)     HUD's award of contract No. DU204SA-13-R-0005 to Alpine for Area 3A is undisturbed for the remainder of the current option year, which concludes on May 31, 2018, but it is **SET ASIDE** and **PERMANENTLY RESTRAINED AND ENJOINED** thereafter.

(b)     In order to secure the services covered by contract No. DU204SA-13-R-0005 for Area 3A beyond May 31, 2018, HUD must either:

(1)     reopen the procurement for the purpose of conducting meaningful discussions with plaintiff, allowing plaintiff to submit a revised proposal, and reevaluating both plaintiff's and Alpine's proposals in light of this court's ruling on the merits of this protest action; or

(2)     conduct a new solicitation for the pertinent services.

(5)     The clerk's office is directed to **ENTER** final judgment in favor of plaintiff;

(6)     In addition, plaintiff is awarded its reasonable costs incurred in bid preparation and proposal.  Plaintiff shall submit its reckoning of such costs on or before **December 22, 2017**, and defendant shall respond to plaintiff's submission on or before **January 19, 2018**;

(7)     On or before **November 22, 2017**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **proposed redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(8)     Each party shall bear its own costs of the present action.


IT IS SO ORDERED.

s/ Patricia Campbell-Smith
PATRICIA CAMPBELL-SMITH
Judge